# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| BUDGET CHARTERS, INC., and ALLEN NEWCOMER, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:17-cv-722 |
| | ) | Judge Aleta A. Trauger |
| IVAN PITTS, in his individual capacity as a Tennessee State Highway Patrolman; WILLIAM MATSUNAGA, in his individual capacity as a Tennessee State Highway Patrolman; BOBBY BARKER, in his individual capacity as a Tennessee State Highway Patrolman; RONNIE SIMMONS, in his individual capacity as a Tennessee State Highway Patrolman; KENT NORRIS, in his individual capacity as a Tennessee State Highway Patrolman; BILL GIBBONS, in his individual capacity; DAVID W. PURKEY, in his official capacity as COMMISSIONER, TENNESSEE DEPARTMENT OF SAFETY AND HOMELAND SECURITY; RICHARD ROBERTS, in his individual capacity; and DAVID GERREGANO, in his official capacity as COMMISSIONER, TENNESSEE DEPARTMENT OF REVENUE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM

Defendants Richard Roberts and Bill Gibbons, in their individual capacities, and Ivan

Pitts, William Matsunaga, Tennessee Department of Safety and Homeland Security ("TDSHS")

Commissioner David W. Purkey, and Tennessee Department of Revenue ("TDR")

Commissioner David Gerregano, in their official capacities, have filed a Motion to Dismiss

Third Amended Complaint (Docket No. 44), to which Budget Charters, Inc. ("Budget") and

Allen Newcomer have filed a Response (Docket No. 49). Defendants Bobby Barker, Ronnie Simmons, and Kent Norris, in their official capacities, have also filed a Motion to Dismiss Third Amended Complaint (Docket No. 56), to which Budget and Newcomer have filed a Response (Docket No. 58). For the reasons set forth herein, Roberts, Gibbons, Pitts, Matsunaga, Purkey, and Gerregano's motion will be granted in part and denied in part, and the motion filed by Barker, Simmons, and Norris will be granted. The court will dismiss all claims against Roberts and Gibbons, as well as all claims for damages against Pitts, Matsunaga, Barker, Simmons, and Norris in their official capacities. All other claims against Pitts, Matsunaga, Barker, Simmons, and Norris, as well as the claims against Purkey and Gerregano in their official capacities, will remain pending.

## I. BACKGROUND & PROCEDURAL HISTORY[1]

Budget Charters, Inc. ("Budget") operates charter buses. It is based in Pennsylvania and owned by Gary and Natalie Shimshock. (Docket No. 41 ¶ 1.) Allen Newcomer is a driver employed by Budget. (*Id.*) On April 21, 2016, Newcomer was operating a Budget bus in Davidson County, Tennessee, in connection with a trip chartered by a group consisting primarily of high school students. (*Id.* ¶¶ 11–13.) While the students were in a museum at Nashville's Centennial Park, Newcomer waited on a park bench reading a book until he was approached by three members of the Tennessee State Highway Patrol ("TSHP"), Sergeant Ronnie Simmons, Sergeant Kent Norris, and Trooper Bobby Barker. Budget and Newcomer maintain that Newcomer had given the patrolmen no basis for reasonable suspicion of any illegal activity and that Budget's bus had no obvious safety problems. Barker, Simmons, and Norris nevertheless

---

[1]The facts are taken from Budget and Newcomer's Third Amended Complaint (Docket No. 41) and are accepted as true for the purposes of the Motions to Dismiss.

"told Plaintiff Newcomer that they wanted to examine the bus" to perform a safety inspection. (*Id.* ¶ 14.)

Upon performing their inspection, the patrolmen informed Newcomer that they had concluded that one of the bus's tires was in unsafe condition. One of the patrolmen placed a red tag on the bus, indicating that it could not lawfully be moved. (*Id.* ¶ 15.) Newcomer telephoned Gary Shimshock, and Shimshock spoke to one of the patrolmen about the situation. Shimshock requested that Newcomer be allowed to drive the bus to a nearby tire store or service station to purchase a new tire or install a spare, but the patrolmen rejected Shimshock's suggestions. (*Id.* ¶ 16.) Eventually, Newcomer's student passengers began returning to the bus from the museum. The patrolmen warned the passengers that the bus was extremely unsafe and prevented them from reboarding. (*Id.* ¶ 17.) At some point shortly thereafter, however, Simmons and Norris concluded—the plaintiffs claim, correctly—that the tire in question was not, in fact, unsafe and that the red tag could be removed. (*Id.*)

Despite the red tag's being removed, Barker announced that he intended to follow the bus back to the passengers' hotel, where he would continue the safety inspection. (*Id.* ¶ 18.) The patrolmen also retained Newcomer's log book, medical certifications, and driver's license, as well as the bus's registration. (*Id.*) Newcomer began driving the bus to the hotel, but, while on Briley Parkway, the bus's engine began to overheat due to a broken hose clamp. The overheating triggered a mechanism that caused the bus's engine to shut down momentarily, although the overheating did not fully disable the bus, which remained capable of restarting and continuing on to its destination. Apparently detecting that something was amiss, Barker turned on his vehicle's blue lights, requiring Newcomer to pull the bus to the side of the road. (*Id.* ¶¶ 21–22.)

Newcomer got off the bus. (*Id.*) Meanwhile, Trooper Ivan Pitts and Lieutenant William Matsunaga were called to the scene. (*Id.* ¶¶ 23–25.) Pitts performed alcohol field sobriety tests on Newcomer, which did not suggest that he had been consuming alcohol. Newcomer did admit, however, that he possessed Vicodin, for which he had a prescription related to a herniated disc, and that he had taken one Vicodin pill the day before. The patrolmen informed Newcomer's passengers that Newcomer was under the influence of drugs and was under arrest and that the passengers, therefore, would have to find some other way to reach the hotel. (*Id.* ¶ 23.)

After arresting Newcomer, Pitts and Matsunaga attempted to have him submit to a jail-administered drug screen. Newcomer, however, had been in intermittent contact with Shimshock throughout the encounter with the patrolmen, and Shimshock insisted that the drug screen be performed by a third party. Quest Diagnostics ("Quest") performed a drug screen on Newcomer at 3:25 p.m., a bit over four hours after the bus had been pulled over. The Quest testing was negative for all covered drugs, as was corroborative screening performed later by the Tennessee Bureau of Investigation. (*Id.* ¶¶ 21–27.)

Nevertheless, Newcomer was taken before a night commissioner and charged with unlawful use of drug paraphernalia, unlawful possession of a controlled substance, and driving under the influence—related, apparently, to Newcomer's possession of the prescribed Vicodin and the presence of a straw on the bus. (*Id.* ¶¶ 28–29.) The night commissioner relied on an affidavit from Pitts, claiming that he observed Newcomer as having "a white powdery substance in his nostrils." Matsunaga was listed as the arresting officer. (*Id.*) Newcomer maintains that none of the troopers mentioned any white powdery substance to him during his initial interaction with them outside the museum; that there had not, in fact, been any white powdery substance on his face or shirt; and that there had been numerous straws left on the bus by students who had

4

been using them with their beverages. (*Id.* ¶ 30.) Newcomer was taken to jail for the night, and Gary and Natalie Shimshock posted his bail the next day. (*Id.* ¶ 31.)

The State eventually entered a *nolle prosequi* on all of the charges against Newcomer, and they were expunged—but only after a number of local Pennsylvania news stories about the incident, including reports mentioning Newcomer and Budget by name. (*Id.* ¶¶ 33–34.) Budget claims to have lost a substantial amount of business because of the negative publicity surrounding the arrest and to have been forced to expend a significant amount of money on a public relations company to attempt to salvage its reputation. Budget also had to pay for another bus company to take Newcomer's passengers to their hotel after Newcomer was arrested, and it was forced to defend itself in a lawsuit from the passengers' organization. (*Id.* ¶ 35.)

The plaintiffs now maintain that the patrolmen's treatment of Newcomer was part of a broader pattern of targeting and harassing out-of-state tour buses—a pattern that Gary Shimshock learned about from a representative of the Tennessee Motor Coaches Association ("TMCA"). The TMCA representative apparently singled out some or all of the defendant patrolmen as involved in that practice. (*Id.* ¶¶ 26, 36, 51.) The plaintiffs allege that former TDSHS Commissioner Bill Gibbons and former TDR Commissioner Richard Roberts failed in their respective duties, under Tenn. Code Ann. § 65-15-101,[2] to adequately oversee the TSHP, leading to widespread disregard of TSHP's statutory and constitutional responsibilities. (*Id.* ¶¶ 38–42.) The plaintiffs fault Gibbons and Roberts—as well as their successors, Purkey and Gerregano—for having failed to promulgate regulations that would have prevented the patrolmen's treatment of Newcomer. (*Id.* ¶¶ 41–43.)

---

[2] Section 65-15-101 "confer[s] upon the department of revenue and the department of safety the power and authority, and mak[es] it the duty of the department of revenue and the department of safety to supervise and regulate the transportation of persons and property by motor vehicle over or upon the public highways of [Tennessee], and to supervise and regulate certain businesses closely allied with such motor transportation, so as to" effect certain identified purposes. Tenn. Code Ann. § 65-15-101(a).

On April 19, 2017, Budget and Newcomer filed their initial Complaint, alleging various constitutional and statutory violations related to the search and seizure of the bus and the arrest of Newcomer. (Docket No. 1.) In the original Complaint, the only patrolmen named by the plaintiffs were Pitts and Matsunaga. The plaintiffs also named Purkey and Gerregano, but not Gibbons or Roberts. (*Id.* at 1.) The named defendants filed a Motion to Dismiss (Docket No. 7) noting, among other things, that Gerregano had not been in office when the events at issue took place. (Docket No. 8 at 2.) On May 19, 2017, the plaintiffs filed a First Amended Complaint, adding Gibbons and Roberts as defendants in their individual capacities. (Docket No. 11.) The court denied the pending Motion to Dismiss as moot in light of the original Complaint's having been superseded by the First Amended Complaint. (Docket No. 13.) The defendants filed a fresh Motion to Dismiss on June 2, 2017. (Docket No. 15.) The defendants argued, among other things, that Budget and Newcomer lacked standing to seek injunctive relief against the defendants, because their alleged injuries were the result of one isolated course of events that took place when Budget, an out-of-state business, happened to be contracted for a trip into Tennessee. (Docket No. 16 at 5–7.) Budget and Newcomer filed a Motion for Leave to Amend First Amended Complaint, seeking to add allegations clarifying that Budget had continued to provide charter buses for trips to Nashville on an ongoing basis. (Docket No. 20; Docket No. 20-1 at 2.) The court granted leave to amend and denied the Motion to Dismiss as moot because the complaint had again been superseded. (Docket No. 21; Docket No. 23.)

The defendants filed a Motion to Dismiss Second Amended Complaint on July 17, 2017. (Docket No. 25.) While that motion was pending, Budget and Newcomer learned, via the defendants' Rule 26 disclosures, that some of the actions that their complaints had attributed to Pitts had actually been performed by Barker, Simmons, and/or Norris. (Docket No. 35-3 at 1–2.)

The plaintiffs filed a Motion for Leave to Amend Second Amended Complaint, seeking to add Barker, Simmons, and Norris as defendants and to revise the operative complaint's allegations to reflect the plaintiffs' newfound better understanding of which actions had been performed by which highway patrolmen. (Docket No. 34.) The court granted the Motion for Leave to Amend and denied the pending Motion to Dismiss as moot. (Docket No. 40 at 14–15.)

In the Third Amended Complaint, each of Pitts, Matsunaga, Barker, Simmons, and Norris is named "in his individual capacity as a Tennessee State Highway Patrolman." Gibbons and Roberts are named in their individual capacities only, and Purkey and Gerregano are named in their official capacities only. (Docket No. 41 at 1.) The plaintiffs plead claims pursuant to 42 U.S.C. §§ 1983 and 1988 for (1) violation of Newcomer and/or Budget's constitutional rights to equal protection of the laws, freedom from deprivation of liberty without due process, freedom from unreasonable searches and seizures, freedom from cruel and inhumane treatment, and freedom from interference in interstate commerce; and (2) violation of Newcomer and/or Budget's rights, under the U.S. Department of Transportation's motor carrier safety assistance program, to be subject to safety inspections only in certain identified situations and settings, 49 U.S.C. § 31102(c)(2)(W). (Docket No. 41 ¶¶ 46–59.)

On November 28, 2017, Pitts, Matsunaga, Roberts, Gibbons, Purkey and Gerregano filed a joint Motion to Dismiss Third Amended Complaint pursuant to Rule 12(b)(1) and 12(b)(6). (Docket No. 44.) With regard to Pitts and Matsunaga, the motion addresses only claims lodged against them in their official, not individual, capacities.[3] (*Id.* at 1.) On February 1, 2018, Barker,

---

[3] There is some confusion about which defendants have been sued in their official capacities—owing in part to the plaintiffs' use of the phrase "in his individual capacity as a Tennessee State Highway Patrolman" to describe the capacity in which they are suing the TSHP defendants. The Sixth Circuit applies a "course of proceedings" test to determine whether a § 1983 defendant has been sued in his individual or official capacity. *Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001). Based on

Simmons, and Norris filed a Motion to Dismiss Third Amended Complaint, also pursuant to Rule 12(b)(1) and 12(b)(6), which similarly focuses only on the claims against them in their official, not individual, capacities. (Docket No. 56.)

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

"Rule 12(b)(1) motions to dismiss . . . generally come in two varieties: a facial attack or a factual attack." *Genetek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). When a Rule 12(b)(1) motion contests subject matter jurisdiction factually, the court must weigh the evidence in order to determine whether it has the power to hear the case, without presuming the challenged allegations in the complaint to be true. *Id.*; *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). When the facts are disputed in this way, "[t]he district court has broad discretion to consider affidavits, documents outside the complaint, and to even conduct a limited evidentiary hearing if necessary," without converting the motion into one for summary judgment. *Cooley v. United States*, 791 F. Supp. 1294, 1298 (E.D. Tenn. 1992), *aff'd sub nom. Myers v. United States*, 17 F.3d 890 (6th Cir. 1994); *see also Genetek*, 491 F.3d at 330. It is then the plaintiff's burden to show that jurisdiction is appropriate. *DLX*, 381 F.3d at 511. If a Rule 12(b)(1) motion challenges subject matter jurisdiction based on the face of the complaint, to the contrary, the plaintiff's burden is "not onerous," and the plaintiff need only demonstrate that the complaint alleges a "substantial" federal claim, meaning that prior decisions do not inescapably render the claim frivolous. *Musson Theatrical Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996). A court evaluating this sort of facial attack to the assertion of subject matter jurisdiction must consider the allegations of fact in the complaint to be true. *Genetek*, 491 F.3d at

the facts alleged and the relief sought, the court will construe the Third Amended Complaint as naming the TSHP defendants in both capacities.

330; *Jones v. City of Lakeland*, 175 F.3d 410, 413 (6th Cir. 1999). Thus, "the plaintiff can survive the motion by showing any arguable basis in law for the claim made." *Musson Theatrical*, 89 F.3d at 1248.

## B. Rule 12(b)(6)

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

# III. ANALYSIS

## A. Official Capacity Claims for Monetary Damages

The defendants first ask the court to dismiss all monetary claims raised against them in their official capacities because (1) the claims are barred by sovereign immunity and (2) the claims are, as a matter of law, actually directed at their respective agencies, which are not "persons" for the purposes of 42 U.S.C. § 1983. *See Thiokol Corp. v. Mich. Dep't of Treasury*, 987 F.2d 376, 381 (6th Cir. 1993) ("[The Eleventh Amendment] bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments."); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989) (holding that the Eleventh Amendment also precludes claims against state officials in their official capacity for damages). *Accord* Tenn. Code Ann. § 20-13-102(a) (barring claims for damages against the state and state officials "with a view to reach the state, its treasury, funds or property" in any "court in the state"); *Berndt v. Tennessee*, 796 F.2d 879, 881 (6th Cir. 1986) ("We are persuaded that section 20-13-102(a) of the Tennessee Code, which expressly prohibits any suits in state court against the state . . . also extends impliedly to suits brought in federal court.").

In response, the plaintiffs argue only that "[w]hether a defendant is liable for acts done in his official capacity is not necessarily the same question as whether damages may be awarded against the State directly for such acts." (Docket No. 58 at 2.) The plaintiffs' argument appears to misunderstand the point that the defendants are making, which is not premised on the capacity in which the defendants acted, but the capacity in which they have been sued. A "suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office" and is, therefore, "no different from a suit against the State itself." *Will*, 491 U.S. at 71 (internal quotation marks and citation omitted). Thus, sovereign immunity "also

applies to actions against state officials sued in their official capacity for money damages." *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (citing *Lapides v. Bd. of Regents*, 535 U.S. 613, 616, 623 (2002); *Edelman v. Jordan*, 415 U.S. 651, 664–66 (1974)). The court, accordingly, will dismiss all claims for damages raised against the defendants in their official capacities.

## B. Claims for Injunctive/Declaratory Relief Against Purkey and Gerregano

### *1. Standing*

Purkey and Gerregano next argue that the court should dismiss the claims for injunctive and declaratory relief against them because the plaintiffs have no standing to raise such claims. Specifically, they argue that Budget and Newcomer have alleged only an isolated series of wholly past events giving rise to their injury and, therefore, have no standing to raise a claim for prospective relief. Budget and Newcomer respond that they continue to operate in Tennessee and that they have alleged not merely a past harm, but an ongoing practice of targeting tour buses— particularly out-of-state tour buses—for unjustified scrutiny and unwarranted safety inspections.

Article III of the Constitution gives the federal courts jurisdiction only over "cases and controversies," of which the component of standing is an "essential and unchanging part*." Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A party seeking to invoke the court's jurisdiction must establish the necessary standing to sue before the court may consider the merits of that party's cause of action. *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990). To establish standing under the Constitution, a plaintiff must show that: (1) he has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579–80 (6th Cir. 2014) (citing *Lujan*, 504 U.S. at

560–61); *see also Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). These constitutional requirements—commonly known as (1) injury-in-fact, (2) causation, and (3) redressability—apply in every case.

When a plaintiff seeks injunctive relief, the plaintiff must demonstrate that there is a non-speculative, imminent threat of ongoing or repeated injury to establish that there is a redressable injury-in-fact. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *Fieger v. Mich. Supreme Court*, 553 F.3d 955, 966 (6th Cir. 2009)). "Redressability . . . requires 'that prospective relief will remove the harm,' and the plaintiff must show 'that he personally would benefit in a tangible way from the court's intervention.'" *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 670 (6th Cir. 2007) (quoting *Warth v. Seldin*, 422 U.S. 490, 505, 508 (1975)). Purkey and Gerregano liken this case to *City of Los Angeles v. Lyons*, in which the Supreme Court held that a man who had allegedly been improperly placed in a chokehold by police did not have standing to seek prospective relief, because he could not show that "he was likely to suffer future injury from the use of the chokeholds by police officers." 461 U.S. at 105. By the same token, Purkey and Gerregano argue, Newcomer and Budget cannot show that they are likely to be subject to a future bogus safety inspection simply because they were allegedly subjected to one in the past.

The court in *Lyons* emphasized the "incredible" level of speculation that was necessary to assume that the plaintiff in that case would be likely to find himself placed in an improper chokehold by Los Angeles police for a second time. 461 U.S. at 106. Such a claim, the Court wrote, would have to hinge on one of two premises: "either, (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized

police officers to act in such manner." *Id.* Because the plaintiff's allegations did not support either premise, the Court reasoned, any prospect of a repeated injury was too speculative to support standing to bring a claim for injunctive relief. *Id.*

The rule announced in *Lyons* is not a formalistic bar on a plaintiff's seeking injunctive relief in a case arising originally out of a past constitutional violation. Rather, the court must look at the substance of the plaintiff's allegations to assess "the *reality* of the threat of repeated injury." *Lyons*, 461 U.S. 95 at 107 n.8. The possibility that Newcomer and Budget might be targeted again by TSHP patrolmen is significantly less speculative than the risk of repeated injury in *Lyons*. This is not a case, like *Lyons*, where the constitutional violation could be visited upon anyone, and the plaintiff's risk of a repeat injury depends on the chance of his having the same bad luck twice. Allen and Newcomer allege a much more specific abuse: the improper targeting of out-of-state tour buses on specious grounds. (Docket No. 41 ¶¶ 36, 51.) In other words, the potential for a future injury to the plaintiffs arises out of their allegation of an ongoing pattern of abuse directed at a particular, limited class of targets of which they are members.

At this stage, Purkey and Gerregano have challenged the plaintiffs' right to bring a claim for prospective relief solely on the face of their Third Amended Complaint. If, once a factual record is developed, the court is revealed not to have jurisdiction, it can dismiss the claims accordingly. Purely on the face of the Third Amended Complaint, however, and construing the plaintiffs' allegations in the light most favorable to their claim of jurisdiction, Budget and Newcomer have set forth a facially plausible basis for concluding that they face a non-speculative, imminent threat of repeated injury due to TSHP patrolmen's targeted mistreatment of out-of-state tour buses. The court, accordingly, will not dismiss the plaintiffs' claims against Purkey and Gerregano for lack of standing.

### 2. Failure to State a Claim for Relief

Purkey and Gerregano argue next that the plaintiffs' claims for injunctive and declaratory relief against them are barred by sovereign immunity and/or are premised on a misunderstanding of the particular laws cited. Specifically, the plaintiffs seek an injunction requiring Purkey and Gerregano to promulgate regulations bringing them into compliance with Tenn. Code Ann. § 65-15-101 and 49 U.S.C. § 31102(c)(2)(W). (Docket No. 41 ¶¶ 60–62.) Purkey and Gerregano argue that sovereign immunity prevents the plaintiffs from suing to enforce state law and that 49 U.S.C. § 31102(c)(2)(W) only places duties on the federal Secretary of Transportation—not Purkey's and Gerregano's respective state agencies.

### a. Reliance on Tenn. Code Ann. § 65-15-101

To prevail on a claim under § 1983, a plaintiff must prove two elements: (1) that he was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law. *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014). The plaintiffs frequently frame their claims for injunctive and declaratory relief pursuant to § 1983 in terms of the Commissioners' general oversight duties pursuant to Tenn. Code Ann. § 65-15-101—leading Purkey and Gerregano to suggest that the plaintiffs are improperly seeking to use § 1983 to enforce state law. Budget and Newcomer, however, appear to concede that they would not be able to sue under § 1983 purely to force TDSHS and TDR to comport with their state-level statutory responsibilities. Rather, the plaintiffs argue that they are permitted to seek an order requiring compliance with Tennessee law, insofar as such injunctive relief would be an appropriate remedy with regard to the alleged violations of federal law. (Docket No. 49 at 8–9.)

Tenn. Code Ann. § 65-15-101(a) sets forth a number of general purposes pursuant to which TDSHS and TDR are instructed to exercise their authority over highway safety in the state, such as "[p]rotect[ing] the welfare and safety of the traveling and shipping public in their use of the highways" and "[p]rotect[ing] the property of the state and its highways from unreasonable, improper or excessive use." Tenn. Code Ann. § 65-15-101(a)(2), (4). Given the fairly general nature of the obligations set forth in Tenn. Code Ann. § 65-15-101(a), one could argue that the plaintiffs' frequent citations to the statute are superfluous, other than insofar as they are necessary to establish the agencies' respective responsibilities. Those superfluous citations, however, have no effect on the viability of the plaintiffs' claims based on violations of federal law. Nor are those federal-law claims undermined by the proposition that complying with federal law might also, through a certain lens, be seen as furthering the purposes outlined in Tenn. Code Ann. § 65-15-101(a). The plaintiffs' citations to Tenn. Code Ann. § 65-15-101, therefore, pose no obstacle to their claims for injunctive relief.

### b. Claims for Relief Pursuant to 49 U.S.C. § 31102(c)(2)(W)

Purkey and Gerregano argue next that the plaintiffs have not pled an actionable violation of 49 U.S.C. § 31102(c)(2)(W). As a general rule, "§ 1983 provides a cause of action for violations of federal statutes as well as the Constitution." *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 508 (1990). Not every federal statute, however, is appropriate for enforcement via a § 1983 claim. "A plaintiff alleging a violation of a federal statute will [not] be permitted to sue under § 1983 [if] (1) 'the statute [does] not create enforceable rights, privileges, or immunities within the meaning of § 1983,' or (2) 'Congress has foreclosed such enforcement of the statute in the enactment itself.'" *Id.* (quoting *Wright v. Roanoke Redev. & Hous. Auth.*, 479 U.S. 418, 423 (1987)).

The provision at issue here, 49 U.S.C. § 31102(c), authorizes the U.S. Secretary of Transportation to make federal funds available to states pursuant to federally approved state plans under the Department of Transportation's Motor Carrier Safety Assistance Program ("MCSAP"). 49 U.S.C. § 31102(c) (setting forth standards for approving state plans), 31104(a)(1) (authorizing motor carrier safety assistance program funds through 2020); *cf. Ind. Bureau of Motor Vehicles v. Orange*, 889 N.E.2d 388, 391 (Ind. Ct. App. 2008) (discussing Indiana's enacting laws to comply with federal motor carrier safety requirements in order "[t]o ensure federal support in highway funding"). "The MCSAP is a Federal grant program that provides financial assistance to States to reduce the number and severity of accidents and hazardous materials incidents involving commercial motor vehicles (CMVs)." 49 C.F.R. § 350.101(a). The state's adoption of an MCSAP-compliant commercial vehicle safety plan ("CVSP") is tied to the state's ability to receive the relevant federal highway funding. *See United States v. Orozco*, 858 F.3d 1204, 1207 (9th Cir. 2017) ("Nevada has also enacted a [CVSP], which complies with the Motor Carrier Safety Assistance Program's requirements for receiving federal highway funding . . . .").

In order to be approved by the Secretary, a state's CVSP must meet a number of requirements, including, as relevant to this case, that the plan "ensures that an inspection of a vehicle transporting passengers for a motor carrier of passengers is conducted at a bus station, terminal, border crossing, maintenance facility, destination, or other location where a motor carrier may make a planned stop (excluding a weigh station)," unless the inspection is justified by "an imminent hazard or obvious safety hazard." 49 U.S.C. § 31102(c)(2)(W). Budget and Newcomer argue that this particular CVSP requirement, if complied with, would have prevented the events of April 21, 2016, because Tennessee authorities would not have been permitted to

initiate an impromptu, non-emergency safety inspection in a setting that, the plaintiffs argue, does not fall into the class of locations permitted under 49 U.S.C. § 31102(c)(2)(W).[4]

Purkey and Gerregano appear to argue that, because the MCSAP is a conditional spending program, its requirements cannot be enforced by way of a private cause of action brought by an injured member of the public and, instead, can only be enforced by the federal Secretary of Transportation. In so doing, the Commissioners resort repeatedly to suggesting that the plaintiffs' theory amounts to an attempt to insert themselves into a "contract," or lack thereof, between Tennessee and the United States. (*See* Docket No. 45 at 3 ("The Plaintiffs allege that former Commissioners Roberts and Gibbons were responsible for entering into a contract with the federal government for purposes of conserving the interest and convenience of the public.") (internal quotation marks omitted), 11 ("Essentially, Plaintiffs complain that former

---

[4] The Third Amended Complaint does not go into much detail regarding Tennessee's MCSAP history, and the plaintiffs, in their briefing, suggest that they will require discovery to know the details of any historical CVSP submissions by the state. (Docket No. 49 at 10.) Some acceptance of relevant funds, however, is implicit in any allegation that the state violated 49 U.S.C. § 31102(c)(2)(W). The very nature of a federal conditional spending program, after all, is that it is voluntary. A state is always free to choose the option of "'not yielding' to federal blandishments when [it does] not want to embrace the federal policies as [its] own." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 579 (2012) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 482 (1923)). The only way that Tennessee could violate the MCSAP, therefore, would be for it to accept the benefit of the federal government's offer but not hold up its end of the bargain.

At least according to records published by the U.S. Department of Transportation, moreover, Tennessee does, in fact, appear to have submitted and received federal approval of a CVSP. *See* Tennessee Commercial Vehicle Safety Plan for the Federal Motor Carrier Safety Administration's Motor Carrier Safety Assistance Program Fiscal Year 2017 (Jan. 6, 2017), *available at* https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/docs/fastact/83176/tennesseeaccepted-20170106.pdf. Indeed, the 2017 CVSP includes a "Certificate of Conformance," signed by then-Commissioner Gibbons, in which the State of Tennessee expressly certifies that "[t]he State will ensure that, except in the case of an imminent or obvious safety hazard, an inspection of a vehicle transporting passengers for a motor carrier of passengers is conducted at a bus station, terminal, border crossing, maintenance facility, destination, or other location where motor carriers may make planned stops (excluding a weigh station)"—repeating, verbatim, the very obligation at issue here. *Id.* at 72. While the existence of a 2017 CVSP does not necessarily establish that such a plan was in effect in April 2016, the court does note that the 2017 CVSP appears to discuss a 2016 CVSP that preceded it. *Id.* at 16–19.

Commissioners Bill Gibbons and Richard Roberts failed to properly enter into a contract with the federal government, and in so doing, violated Tenn. Code Ann. § 65-15-101 *et seq.*"), 12 ("Plaintiffs are asking this Court to find that these Defendants are liable solely on the basis that they failed to enter into a contract with the federal government . . . ."), 16 ("Plaintiffs have not, and cannot, demonstrate that there is any clearly established right to force a state official to enter into a contract with the federal government . . . .").) Although the Supreme Court has noted that a federal conditional spending program is "much *in the nature of* a contract" and has "applied the contract-law *analogy*" in conditional spending cases, it has also "been careful not to imply that all contract-law rules apply." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (quoting & citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985)) (emphasis altered). Section 31102(c) is a federal statute, not a provision in a contract. A violation of 49 U.S.C. § 31102(c)(2)(W) is no less a statutory violation simply because conditional spending was involved.

Indeed, the Supreme Court has left little doubt that, where the necessary conditions are met, the violation of a right under a federal conditional spending program can give rise to a claim under § 1983. *See Wilder*, 496 U.S. at 502, 524 (finding that a plaintiff can raise a § 1983 claim pursuant to a statutory right related to Medicaid, "a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals"); *see also New York v. United States*, 505 U.S. 144, 209 (1992) (White, J., dissenting) (collecting cases); *Hughlett v. Romer-Sensky*, 497 F.3d 557, 565 (6th Cir. 2006) (discussing "instances when the [Supreme] Court has found an individual right enforceable under § 1983 within spending legislation"). Even if the federal government, in such a program, retains the "authority to audit . . . and cut off federal funds," those "generalized

powers are insufficient to indicate a congressional intention to foreclose § 1983 remedies." *Wright*, 479 U.S. at 428 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704–707 (1979); *Rosado v. Wyman*, 397 U.S. 397, 420 (1970)).

In order for a statutory provision to be enforceable through § 1983, "1) 'Congress must have intended that the provision in question benefit the plaintiff'; 2) the asserted right must not be 'so vague and amorphous that its enforcement would strain judicial competence'; and 3) 'the statute must unambiguously impose a binding obligation on the States.'" *D.O. v. Glisson*, 847 F.3d 374, 377 (6th Cir. 2017) (quoting *Blessing v. Freestone*, 520 U.S. 329, 340–41 (1997)). The court must consider, in particular, whether the federal statute at issue includes "the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights." *Id.* at 378 (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002)). Purkey and Gerregano advance no argument pursuant to that test, choosing to rely entirely on their contract-law analogy and the contention that 49 U.S.C. § 31102(c)(2)(W) is categorically inappropriate for enforcement through a private cause of action. Because the grounds that Purkey and Gerregano have raised for the court to dismiss the plaintiffs' claims against them for injunctive relief fail, their motion will be denied, insofar as it seeks dismissal of those claims pursuant to Rule 12(b)(6).

## C. Claims Against Gibbons and Roberts

Former Commissioners Gibbons and Roberts argue that the claims against them should be dismissed because the claims improperly rely on a *respondeat superior* theory of liability. The plaintiffs argue, in response, that Gibbons and Roberts can be held liable under § 1983 because each was "in a position of responsibility" and "knew or should have known" about facts that

would have allowed them to prevent the plaintiffs' injury. (Docket No. 49 at 11 (emphasis omitted).)

"*Respondeat superior*[5] is not a proper basis for liability under § 1983. Nor can the liability of supervisors be based solely on the right to control employees, or simple awareness of employees' misconduct." *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006) (citations and internal quotation marks omitted). "In order for supervisory liability to attach, a plaintiff must prove that the official 'did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on.'" *Loy v. Sexton*, 132 F. App'x 624, 626 (6th Cir. 2005) (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)). In other words, "liability under § 1983 must be based on active unconstitutional behavior . . . ." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (citing *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir. 1998), *cert. denied*, 526 U.S. 1115 (1999)). "A supervisor's awareness of allegations of unconstitutional conduct and failure to act are not a basis for liability." *McCurtis v. Wood*, 76 F. App'x 632, 634 (6th Cir. 2003) (citing *Shehee*, 199 F.3d at 300).

The plaintiffs suggest that ongoing discovery may uncover facts that would support a greater finding of culpability for Gibbons and Roberts with regard to the TSHP's treatment of tour bus operators. (Docket No. 49 at 12.) The mere prospect of uncovering sufficient facts in discovery, however, does not excuse the plaintiffs from the need to plead facts upon which relief could be granted in their complaint. *See Krygoski Const. Co. v. Flanders Indus., Inc.*, No. 2:08-CV-202, 2009 WL 722611, at *5 (W.D. Mich. Mar. 17, 2009) ("Plaintiff's speculation that during the course of discovery it might find evidence to bring its claim . . . is insufficient to defeat Defendant's motion to dismiss."). The allegations against Gibbons and Roberts in the

---

[5] *Respondeat superior* is "the doctrine under which liability is imposed upon an employer for the acts of his employees committed in the course and scope of their employment." Ballentine's Law Dictionary (3d ed. 1969).

Third Amended Complaint do not rise above the general contention that, through their inaction, they failed to prevent the patrolmen's alleged mistreatment of Newcomer. (See Docket No. 41 ¶¶ 37–39, 42, 51–52.) Accordingly, the claims against the former Commissioners will be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Roberts, Gibbons, Pitts, Matsunaga, Purkey and Gerregano's Motion to Dismiss Third Amended Complaint (Docket No. 44) will be granted in part and denied in part, and the (partial) Motion to Dismiss Third Amended Complaint filed by Barker, Simmons, and Norris (Docket No. 56) will be granted. The court will dismiss all claims against Roberts and Gibbons, as well as all claims for damages against Pitts, Matsunaga, Barker, Simmons, and Norris in their official capacities. All other claims against Pitts, Matsunaga, Barker, Simmons, and Norris, as well as the claims against Purkey and Gerregano in their official capacities, will remain pending.

An appropriate order will enter.

ENTER this 11th day of April 2018.

_____
ALETA A. TRAUGER
United States District Judge