| | | |
|---|---|---|
| BUDGET CHARTERS, INC., and ALLEN NEWCOMER, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:17-cv-722 |
| | ) | Judge Aleta A. Trauger |
| IVAN PITTS, in his individual capacity as a Tennessee State Highway Patrolman; WILLIAM MATSUNAGA, in his individual capacity as a Tennessee State Highway Patrolman; BOBBY BARKER, in his individual capacity as a Tennessee State Highway Patrolman; RONNIE SIMMONS, in his individual capacity as a Tennessee State Highway Patrolman; KENT NORRIS, in his individual capacity as a Tennessee State Highway Patrolman; BILL GIBBONS, in his individual capacity; DAVID W. PURKEY, in his official capacity as COMMISSIONER, TENNESSEE DEPARTMENT OF SAFETY AND HOMELAND SECURITY; RICHARD ROBERTS, in his individual capacity; and DAVID GERREGANO, in his official capacity as COMMISSIONER, TENNESSEE DEPARTMENT OF REVENUE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM

Budget Charters, Inc. ("Budget") and Allen Newcomer have filed a Motion for Partial

Summary Judgment (Docket No. 75) (later refiled as a duplicative First Motion for Partial

Summary Judgment (Docket No. 79)), to which defendants Trooper Bobby Barker,

Commissioner David Gerregano, Sergeant William Matsunaga, Sergeant Kent Norris, Trooper[1] Ivan Pitts, Commissioner David W. Purkey, and Sergeant Ronnie Simmons have filed a Response (Docket No. 87), and Budget and Newcomer have filed a Reply (Docket No. 94). Budget and Newcomer have filed a Second Motion for Partial Summary Judgment (Docket No. 78), to which the defendants have filed a Response (Docket No. 92), and Budget and Newcomer have filed a Reply (Docket No. 103). The defendants have filed a Motion for Summary Judgment (Docket No. 83), to which Budget and Newcomer have filed a Response (Docket No. 111), and the defendants have filed a Reply (Docket No. 114). For the reasons set out herein, the defendants' motion will be granted, and the plaintiffs' motions will be denied.

## I. BACKGROUND & PROCEDURAL HISTORY

Budget is a Pennsylvania based company that charters buses throughout the United States and Canada. (Docket No. 120 ¶ 1.) The defendants are various Tennessee State Highway Patrol ("TSHP") troopers, as well as two Commissioners whose departments oversee the TSHP. On April 21, 2016, Newcomer, a Budget employee, was driving a chartered bus for the California Area Band Association of Coal Center, Pennsylvania on a trip to Nashville. (*Id.* ¶ 2.) The 55-passsenger group included 38 high school students. (*Id.* ¶ 3.) That morning, the group visited the Parthenon in Nashville's Centennial Park, a stop reflected on the trip itinerary. (*Id.* ¶ 4.) The same morning, Trooper Barker, Sergeant Simmons, and Sergeant Norris—who were assigned to TSHP's Cookeville district—had traveled to Nashville to perform "point of destination" or "scheduled stop" inspections of motor coaches, pursuant to a specific federal grant overtime program covering that purpose. (*Id.* ¶ 8.) According to the defendants, "[a] point of destination or

---

[1] Some of the troopers in this case have experienced changes in title since the events in question, either due to promotion or leaving the force. The court will use the preferred titles used by their counsel.

planned stop refers to an inspection at a location where the carrier had planned to stop based on an itinerary." (*Id.* ¶ 9.)

Newcomer parked the bus at the Parthenon at around 9:00 a.m., and his passengers went inside the building. At around 10:00 a.m., while Newcomer waited on a bench, Trooper Barker approached Newcomer and informed him that the TSHP "needed to do an inspection on the bus." (*Id.* ¶¶ 11–12; Docket No. 83-6 (Newcomer Deposition) at 88.) Newcomer responded "okay" and did not object to the inspection. (Docket No. 120 ¶ 13.) Trooper Barker took Newcomer's log book, driver's license, registration and medical card back to his TSHP vehicle to perform documentation related to the inspection. (*Id.* ¶¶ 14–15.)

Federal law limits the number of hours a motor carrier driver is permitted to drive in a particular period, but a driver may be able to skirt those limitations by understating the duration of a particular trip in his log. (*Id.* ¶ 20.) TSHP uses a computer program called "PC Miler" to calculate what TSCHP considers appropriate drive times for particular motor carrier trips. TSHP may compare PC Miler to check the log book's accuracy. (*Id.* ¶ 18.) Newcomer's log book stated that he had driven for 8.5 hours from the time he left Adah, Pennsylvania and when he arrived at a Nashville destination that, he maintains, was a Shoney's restaurant location. Using PC Miler, Trooper Barker calculated that the drive should have taken 9 hours and 50 minutes—which, combined with the short subsequent drive from the group's motel to the Parthenon, would have placed him over the 10-hour limit imposed by federal regulations. Newcomer maintains that Barker miscalculated the projected drive time because he assumed an incorrect route for Newcomer's bus. (*Id.* ¶ 19.) Trooper Barker recorded various alleged violations of federal regulations, including Newcomer's alleged violation of the 10-hour limit and alleged issues with tires on the bus's third axle. (*Id.* ¶ 17; Docket No. 83-13 (Driver/Vehicle Examination Report) at

1.) Three of those violations were "mandatory out-of-service" violations, meaning that they warranted the bus being placed out of service until they were rectified. (Docket No. 120 ¶ 17.)

Trooper Barker contacted Sergeant Simmons and Sergeant Norris and informed them that he had identified a bus that, he claimed, had signs of side wall separation in one of its tires. Sergeant Norris and Sergeant Simmons, who were riding in the same vehicle that day, came to the scene. (Docket No. 83-1 (Barker Deposition) at 27–28.) Newcomer maintains that, other than a small chip that did not affect the tire's functioning or safety, there was nothing wrong with the tire at issue. (Docket No. 120 ¶ 21; Docket No. 78-4 (Newcomer Deposition) at 94–95.) Trooper Barker claims that Sergeant Norris and Sergeant Simmons agreed with his assessment of the bus's tire. (Docket No. 120 ¶ 21; Docket No. 83-1 (Barker Deposition) at 29.)

Eventually, the troopers allowed Newcomer to load his passengers onto the bus, despite the mandatory out-of-service violations. The troopers maintain that, "[r]ather than putting the bus out of service at the Parthenon, the troopers agreed, at the request of the chaperones on the trip, to allow the bus to travel to the group's hotel by Opry Mills and finish the inspection there." (Docket No. 120 ¶ 22.) Newcomer has testified that the troopers reached their decision following a phone conversation with Budget owner Gary Shimshock. (Docket No. 78-4 (Newcomer Deposition) at 104.) Shimshock, in his testimony, described asking a trooper if Newcomer could find a location to fix the tire before his passengers came back, which the trooper refused before hanging up. (Docket No. 78-5 (Shimshock Deposition) at 55. Eventually, however, the troopers, by Newcomer's description, "decided to let me load the kids back on the bus, remove the red tag [indicating out-of-service status], and take the kids back to the hotel." (Docket No. 78-4 (Newcomer Deposition) at 104.) When asked what he thought when he learned of the troopers' decision, Newcomer testified that he was "happy to get away from them." (*Id.*)

Trooper Barker informed Newcomer that he would be following the bus back to the hotel to finish the inspection. (Docket No. 120 ¶ 23.) While Newcomer drove the bus back toward the hotel, Trooper Barker retained Newcomer's log book, license, and registration. (*Id.* ¶ 24.) The defendants maintain that doing so was "standard procedure." (*Id.*) Budget and Newcomer dispute that characterization, arguing that there is no standard procedure for allowing a bus driver to drive to another location after his bus is found to have mandatory out-of-service violations, because troopers are not intended to have the discretion to allow a bus back on the road with such a violation left uncured. (*Id.*)

While Newcomer drove the bus back to the hotel, the bus experienced technical difficulties that caused it to repeatedly shut down and have to be restarted. As a result, the bus was going very slowly on the interstate. The bus also began overheating and spraying liquid onto Trooper Barker's vehicle. Trooper Barker initiated a stop of the bus, and Newcomer pulled off to the side of the road. (Docket No. 120 ¶¶ 26–28.) Sergeants Simmons and Norris arrived shortly thereafter. Newcomer voluntarily got off the bus and went to the vehicle's rear to investigate the situation. (Docket No. 120 ¶¶ 29–30.) Sergeant Simmons asked Newcomer if he could smell the fluid that had been emitting from the bus, and Newcomer responded that he could not, explaining, allegedly, that his "nose [was] stopped up." (*Id.* ¶ 31; Docket No. 83-1 (Barker Deposition) at 41.)

Barker claims that, at this point, he and Sergeant Simmons noticed white powder in Newcomer's nose. (Docket No. 83-1 (Barker Deposition) at 41; see also (Docket No. 83-7 (Simmons Deposition) at 21 (claiming to have noticed the powder).) Newcomer denies that he had any white powder in his nose and suggests that, if anything, Barker might have been noticing the severe nasal drainage that Newcomer was suffering on that day. (Docket No. 120 ¶ 32.) One

of the troopers asked Newcomer "what he had been snorting." (Docket No. 120 ¶ 33.) Newcomer responded that he had not been snorting anything but that he had a sinus condition and had been using nasal spray. (*Id.* ¶¶ 34, 39.) During the exchange, Newcomer said to Sergeant Simmons, "I know it's all white," referring, apparently, to what Newcomer claims was nasal discharge or a mixture of nasal discharge and nose spray. (*Id.* ¶ 35.) A passenger on the bus, chaperone Ann Trunzo, has testified that Newcomer had, indeed, been experiencing "a lot of drainage" and "crusties" on his nose that day and that Trunzo had not seen any powder on his clothing. (Docket No. 112-1 (Trunzo Deposition) at 9, 26, 29.)

Sergeant Simmons told Newcomer that he suspected Newcomer had "been snorting pills or something or . . . methamphetamine." (Docket No. 120 ¶ 40.) Trooper Barker asked Newcomer if he was taking any medications, to which Newcomer responded "just blood pressure." (*Id.* ¶ 41.) Trooper Barker asked if Newcomer was on any other medication, and Newcomer replied "that's it." (*Id.* ¶ 42.)

Eventually, Sergeant Simmons asked Newcomer if he objected to the troopers' searching Newcomer's bag, jacket, and person. Newcomer said "no, go right ahead" three times. (*Id.* ¶ 45.) Before the troopers initiated a pat-down, Newcomer volunteered that he had pain medication, on his person, that had been prescribed to him. (*Id.* ¶¶ 47, 52.) Video of the incident shows that Sergeant Simmons asked Newcomer, "Is that what you have been snorting?" Newcomer responded, "Yes, sir, but I haven't since last night." Newcomer maintains that he was nervous and did not intend to respond affirmatively or indicate that he had been snorting anything, having just explained that anything in his nostrils was congestion-related. (*Id.* ¶ 53; Video #137 at 11:42:52–11:43:03.)

Someone—either Newcomer or one of the troopers—pulled a blue pill bottle from Newcomer's pants. According to Trooper Barker, the bottle contained "crushed up pills and a very short straw [of] about maybe two inches." (Docket No. 83-1 (Barker Deposition) at 42.) Newcomer maintains that the pill bottle contained pills, some of which had "crumbled." He denies having crushed any of the pills and denies that there was a straw in the bottle. (Docket No. 112-3 (Newcomer Affidavit) at 1.) It is undisputed that, at the time, Newcomer had a prescription for Norco, a pain medication containing hydrocodone and acetaminophen, although the pill bottle he was carrying did not have a label indicating that its contents were pursuant to that prescription. (Docket No. 120 ¶¶ 56–57.) Newcomer told the troopers that he had the labeled prescription bottle in his suitcase under the bus and that he did not take more than prescribed. (*Id.* ¶¶ 58–60.)

The defendants claim that video of the stop shows that "Newcomer told Sgt. Simmons that he had last snorted the medication at 6:00 p.m. on April 20, 2016, and he started driving the bus at 8:00 p.m. that same night." (*Id.* ¶ 62.) The court has reviewed the portions of the video cited, 12:20:15 through 12:20:26, as well as the immediately preceding portion of the conversation, and, while portions of the video are unintelligible or nearly so, the court has been unable to identify any clear indication that Newcomer was conceding that he snorted the medication. The two men discuss when Newcomer "took" the medication, and nothing about Newcomer's answer appears to suggest that he is admitting to taking the medication in any way other than as directed:

> **Simmons: So, how long you been driving the bus?**
> *Newcomer: About ten years.*
> **Ten years.**
> *Like any other job, good and bad.*

**Yeah, what do you take the hydrocodone for?**

*I have a bad back and hip.*

**Bad back and hip.**

*And they've offered me disability but I don't want disability.*

**How long you been driving the bus, [inaudible] years?**

*About, yeah.*

**When you took the medication, like, about what, did you take it for supper or what?**

*Right before supper.*

**And you didn't take any more?**

*No.*

**About 6:00?**

*Yes, sir.*

(Video #137 at 12:19:48–12:20:23.) The court construes the defendants' characterization, therefore, as relying on Newcomer's earlier admission—which he claims was inadvertent and inaccurate—that his pain medication was "what [he] ha[d] been snorting." (Video #137 at 11:42:52–11:43:03.)

Newcomer and Sergeant Simmons retrieved Newcomer's suitcase from the bus, and the troopers searched it, as well as his jacket and shaving kit. (Docket No. 120 ¶¶ 63–65.) In his suitcase, the troopers found a red prescription bottle containing blood pressure medication and a blue prescription bottle for Norco. (*Id.*; Docket No. 83-6 (Newcomer Deposition) at 125.) The troopers found one pill for 10 mg of Norco, despite the fact that Newcomer's current prescription was for 7.5 mg. Newcomer has testified that he had earlier been on 10 mg of Norco and had asked for his dosage to be reduced. (Docket No. 120 ¶ 67; Docket No. 83-6 (Newcomer Deposition) at 58.)

Sergeant Norris and Trooper Barker decided to call in a local, Nashville-based trooper to assist. (Docket No. 120 ¶ 68.) Sergeant Matsunaga arrived, followed by Trooper Pitts. (*Id.* ¶¶ 69–

71.) In the meantime, Budget's owner, Gary Shimshock, had arranged for another bus to come and pick up the stranded passengers. The passengers were loaded onto that bus, and it pulled away from the scene as Trooper Pitts arrived. (*Id.* ¶ 73.) The troopers who had already been on the scene explained aspects of the situation to Sergeant Matsunaga and Trooper Pitts. (*Id.* ¶¶ 74–75.) At one point, Newcomer, speaking to Trooper Pitts, apparently states that he ground up one of his pills the night before with a "dollar bill and a lighter." The large amount of ambient noise from the wind and ongoing traffic make this portion of the video difficult to understand, but Newcomer appears to confirm that he made some comments along the lines of those described— although he states that he was merely being a "smart ass" and was not telling the literal truth. (Video # 534 at 13:08:58–:13:09:30; Docket No. 112-9 (Newcomer Deposition) at 167–69.)

Trooper Pitts performed what the defendants describe as a "standard field sobriety test" on Newcomer. (Docket No. 120 ¶ 80.) During the test, Trooper Pitts stated, "He's got white powder all over his shirt." (Video # 534 at 13:17:50–:55.) Newcomer denies that there was any white powder on his shirt, and the video documenting the field sobriety test does not clearly show any powder. (*Id.*; Docket No. 112-3 (Newcomer Affidavit) at 1.) Trooper Pitts and Sergeant Matsunaga, who assisted with the test, claim that the field sobriety test revealed indications of intoxication, particularly constricted pupils that were not responsive to light. (Docket No. 120 ¶ 84.) The plaintiffs have provided an affidavit from Charles E. Smith, a former Miami police officer and current consultant, identifying multiple alleged flaws in Trooper Pitts' administration of the test, as well as reasons why the test, as administered, should not have been interpreted as indicating intoxication. (Docket No. 94-1 at 3–6.)

Trooper Pitts arrested Newcomer for unlawful possession of a controlled substance, unlawful use of drug paraphernalia, and driving under the influence. (Docket No. 120 ¶ 86.)

Pitts submitted pills from Newcomer's unlabeled blue pill bottle, as well as the straw alleged to have come from that bottle, into evidence with regard to that arrest. Newcomer disputes that the straw admitted into evidence was ever in his possession and notes that there were numerous straws on the bus that students had used with their drinks. (*Id.* ¶ 87.) Over the course of the day and night of his arrest, blood, urine, and breath tests were performed on Newcomer. None of the tests confirmed the presence of drugs or alcohol, although the blood sample did show trace amounts of hydrocodone, in an "amount [that] did not meet the acceptance criteria"[2] required by the Tennessee Bureau of Investigation's toxicology policy. (Docket No. 87-1 ¶¶ 3–7; Docket No. 87-2 at 2.)

On April 19, 2017, Budget and Newcomer filed suit under 42 U.S.C. § 1983 against Trooper Pitts, Sergeant Matsunaga, Tennessee Department of Safety and Homeland Security ("TDSHS") Commissioner David W. Purkey, and Tennessee Department of Revenue ("TDR") Commissioner David Gerregano. (Docket No. 1.) Shortly thereafter, they amended the Complaint to include Purkey's predecessor, Bill Gibbons, and Gerregano's predecessor, Richard Roberts. (Docket No. 11.) On November 14, 2016, the court granted leave to amend the Complaint to add Trooper Barker, Sergeant Simmons and Sergeant Norris as defendants. (Docket Nos. 40 & 41.) Budget and Newcomer have alleged violations of the Fourth and Fourteenth Amendments related to the searches of Newcomer and the bus and Newcomer's

---

[2] Tennessee Bureau of Investigation Special Agent/Forensic Scientist Joseph A. Castelbuono provided an affidavit explaining that he "conducted a basic drug test of Mr. Newcomer's blood sample that included hydrocodone as one of the drugs being tested." (Docket No. 87-2 ¶ 6.) The results he provided show no concentration of most drugs, but do indicate a small amount of hydrocodone. (*Id.* at 23.) Castelbuono has explained that the amount of hydrocodone detected was so small that, pursuant to TBI's policy for reaching conclusions from toxicology results, Newcomer was entitled to an official conclusion of "No Basic Drugs Detected." (*Id.* ¶¶ 8–9.) That is the result reflected on TBI's Official Toxicology Report. (*Id.* at 8.) The defendants have produced no evidence to suggest that the trace amount of hydrocodone detected was consistent with anything other than an ordinary therapeutic dose, if that. Nor have the defendants produced any evidence to suggest that a trace amount of hydrocodone would establish, or even suggest, intoxication.

arrest; violation of the Eighth Amendment with regard to the allegedly cruel and inhumane treatment of Newcomer; violations of Budget's rights under the Commerce Clause to engage freely in interstate travel and commerce; violations of the Fourteenth Amendment related to Tennessee's alleged targeting of out-of-state tour buses; and violations of federal motor carrier safety statutes, namely 49 U.S.C. § 31102(c)(2)(W).

The defendants filed a Motion to Dismiss (Docket No. 44), which the court granted in part and denied in part, dismissing all claims against former Commissioners Roberts and Gibbons and all claims for money damages against the various troopers in their official capacities (Docket No. 60). Following discovery, the parties filed their motions for summary judgment (Docket Nos. 75, 78, 79, 83.)

## II. LEGAL STANDARD

"Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Conversely, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of her claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable

to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

### III. ANALYSIS

#### A. The Defendants' Motion for Summary Judgment

#### 1. Initial Inspection

The plaintiffs argue that the troopers' inspection of the bus at the Parthenon and their surrounding actions amounted to an unconstitutional seizure of Newcomer and/or Budget's bus.[3] The defendants respond that the troopers merely performed a standard motor carrier safety inspection, as specifically contemplated by federal and Tennessee law.

The U.S. Secretary of Transportation is authorized to make federal funds available to states pursuant to federally approved state plans under the Department of Transportation's Motor Carrier Safety Assistance Program ("MCSAP"). 49 U.S.C. § 31102(c) (setting forth standards for approving state plans), 31104(a)(1) (authorizing motor carrier safety assistance program funds

---

[3] Preliminarily, the defendants argue that the claims against Trooper Barker are untimely. The defendants' argument, however, focuses entirely on whether the plaintiffs are entitled to rely on equitable estoppel against him. As the court has already explained, the claims against Trooper Barker, unlike the claims against the other late-added troopers, are likely timely under Fed. R. Civ. P. 15(c)(1)(C) provision allowing relation back for allegations involving the correction of a misnomer. (Docket No. 40 at 7–11.) The defendants do not undermine that holding. Accordingly, it is unnecessary to consider the applicability of equitable estoppel to Trooper Barker.

through 2020); *cf. Ind. Bureau of Motor Vehicles v. Orange*, 889 N.E.2d 388, 391 (Ind. Ct. App. 2008) (discussing Indiana's enacting laws to comply with federal motor carrier safety requirements in order "[t]o ensure federal support in highway funding"). "The MCSAP is a Federal grant program that provides financial assistance to States to reduce the number and severity of accidents and hazardous materials incidents involving commercial motor vehicles (CMVs)." 49 C.F.R. § 350.101(a). The state's adoption of an MCSAP-compliant commercial vehicle safety plan ("CVSP") is tied to the state's ability to receive the relevant federal highway funding. *See United States v. Orozco*, 858 F.3d 1204, 1207 (9th Cir. 2017) ("Nevada has also enacted a [CVSP], which complies with the Motor Carrier Safety Assistance Program's requirements for receiving federal highway funding . . . ."). In order to be approved by the Secretary, a state's CVSP must meet a number of requirements, including, as relevant to this case, that the plan "ensures that an inspection of a vehicle transporting passengers for a motor carrier of passengers is conducted at a bus station, terminal, border crossing, maintenance facility, destination, or other location where a motor carrier may make a planned stop (excluding a weigh station)," unless the inspection is justified by "an imminent hazard or obvious safety hazard." 49 U.S.C. § 31102(c)(2)(W). It is undisputed that Tennessee has submitted and obtained approval of a CVSP.

The plaintiffs concede that, pursuant to the MCSAP and CVSP, the troopers "had a right to inspect" the bus at the Parthenon. (Docket No. 78-1 at 1.) Indeed, the students' visit to the Parthenon seems to meet the ordinary-language definition of a "planned stop," at which an inspection would have been permissible. The plaintiffs, however, take issue with some aspects of the inspection. For example, Newcomer complains that he was not allowed to leave mid-inspection, that he was not allowed to take the bus to get its allegedly faulty tire changed, and

that troopers "got very nasty" and "intimidated" him. (*Id.* at 2.) He has not, however, articulated any federal right that was contravened by any of those decisions.

The Supreme Court has repeatedly acknowledged that inspections of commercial operators in pervasively regulated industries are subject to relaxed Fourth Amendment protections. *See Hopkins Cty. Coal, LLC v. Acosta*, 875 F.3d 279, 292 (6th Cir. 2017) (collecting cases and examples of pervasively regulated industries). The commercial carrier industry has been repeatedly held to be pervasively regulated. *See United States v. Delgado*, 545 F.3d 1195, 1201–02 (9th Cir. 2008) (collecting cases); *United States v. Dominguez-Prieto*, 923 F.2d 464, 468 (6th Cir. 1991) (holding that commercial trucking is pervasively regulated).

A commercial inspection in a pervasively regulated industry is constitutionally permissible as long as it meets three requirements:

> (1) "[T]here must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be 'necessary' to further [the] regulatory scheme"; and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant."

*City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2456 (2015) (quoting *New York v. Burger*, 482 U.S. 691, 702–03 (1987)). The plaintiffs do not dispute that there is a substantial government interest in motor carrier safety or that at least some warrantless inspections are necessary to further that interest. Rather, they argue that Tennessee's scheme fails the third requirement, providing a constitutionally adequate substitute for a warrant.

For an inspection to provide a constitutionally adequate substitute for a warrant, it must "[1] advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope . . . and . . . [2] limit the discretion of the inspecting officers." *Burger*, 482 U.S. at 703. The plaintiffs urge the court to adopt the analysis of the

Tennessee Court of Criminal Appeals in *State v. McClure*, 74 S.W.3d 362 (Tenn. Crim. App. 2001), in which it held that the version of Tennessee's motor carrier safety inspection regime, as it existed at the time, did not sufficiently restrict the discretion of law enforcement:

> Essentially, the decision of whom to seize and when to seize is an arbitrary decision left to the unfettered discretion of officers in the field. Certainly, the decision to seize is not made pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers. Because the decision to perform a safety inspection is so arbitrary and unpredictable, we do not believe that a commercial motor carrier owner or operator could have any real expectation that his or her vehicle would be subject to periodic inspection.
>
> Accordingly, we hold that the regulatory scheme at issue in this case does not satisfy the third requirement of [the test for inspections in pervasively regulated industries]: It is not a constitutionally adequate substitute for a warrant in terms of the certainty and regularity of its application.

*Id.* at 376 (internal quotation marks and citations omitted). The defendants respond that Tennessee's current system is not one of arbitrary, unfettered discretion, but a system that is closely regulated by state and federal regulations and the terms of its CVSP. For example, 49 U.S.C. § 31102(c)(2)(W), by requiring that inspections only be performed at certain select times and locations, ensures that the time and place of an inspection are not subject to the unfettered discretion of the troopers.

Of course, the troopers still retain a significant amount of discretion, because they can choose to inspect a motor carrier at one of the approved junctures or not to inspect it all. That same discretion, however, exists under ordinary Fourth Amendment circumstances as well. Nothing in the Fourth Amendment prevents law enforcement from pursuing some probable cause-supported searches but not others. The warrant requirement limits discretion, but it does not, at least as currently interpreted in case law, come anywhere near eliminating it. Similarly, the MCSAP and CVSP significantly limit discretion by requiring that inspections be performed in only certain specific circumstances. Drivers and carriers, moreover, are put on alert as to the

possibility of such searches by federal statutes and Tennessee's publicly available CVSP. The court, therefore, will grant the defendants summary judgment with regard to any claims based on the argument that Tennessee's system of commercial vehicle inspections is unconstitutional.

## 2. Alleged Seizure Tantamount to Arrest of Newcomer at the Parthenon

Newcomer argues that the troopers' treatment of him at the Parthenon was the equivalent of an arrest and that any arrest, at that point, was unreasonable and unlawful. The defendants respond that their interaction with Newcomer at the Parthenon was merely ordinary communication incident to a constitutionally valid commercial inspection.

"[N]ot all seizures are tantamount to arrests sustainable only upon probable cause." *Cherrington v. Skeeter*, 344 F.3d 631, 638 (6th Cir. 2003) (citing *Michigan v. Summers*, 452 U.S. 692, 696–97 (1981); *Dunaway v. New York*, 442 U.S. 200, 208–10 (1979)). For example, in some cases, a law enforcement officer may, despite lacking probable cause, briefly detain a person for investigatory purposes, *see U.S. v. Arvizu*, 534 U.S. 266, 273 (2002), or take a child into protective custody to protect against imminent danger of harm, *see Cherrington*, 344 F.3d at 638 (collecting cases). If, however, law enforcement officers exceed the scope of a valid, non-arrest seizure, then their actions may become constitutionally tantamount to an arrest. The plaintiffs suggest that, in determining whether that was the case here, the court should look to the factors identified by the Sixth Circuit for considering similar issues in relation to investigatory detentions:

> To determine whether an investigative detention has crossed the line and become an arrest, this court considers factors such as "the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons or bodily force."

*United States v. Lopez-Arias*, 344 F.3d 623, 627 (6th Cir. 2003) (quoting *United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991)). Although the defendants argue that those factors should not apply to commercial inspections, the factors provide at least relevant guidance for the court's consideration.

Construing the evidence in the light most favorable to the plaintiffs and construing all contested facts in their favor, the plaintiffs still have not sufficiently established that a detention tantamount to arrest occurred at the Parthenon. While Newcomer was arguably somewhat restricted in his movement, in that he was required to participate in the inspection and his driver's license was taken away, he was not physically confined or coerced. To the contrary, the facts, at that point, show only a commonplace commercial inspection of a motor carrier, which the court has already held to have been lawful. Any seizure of Newcomer based on the events at the Parthenon, therefore, was reasonable and did not require a warrant.

Newcomer next complains that the decision to take his driver's license but allow him to drive the bus back to the hotel amounts to a seizure tantamount to arrest. By allowing him onto the road without a license and closely following the bus, Newcomer argues, the troopers were effectively seizing him by restricting his lawful movement. Newcomer, however, has conceded that he was happy to be allowed to leave and characterized the troopers as having "let" him do so. (Docket No. 78-4 (Newcomer Deposition) at 104.) There is no evidence to suggest that Newcomer lacked the alternative option, if he preferred, of leaving the bus out of operation at the Parthenon, arranging alternate transportation for the passengers, and departing freely by other means. Newcomer has not identified any basis for concluding that the troopers' merely *allowing* him to drive to the hotel was in any way equivalent to an arrest. Nor was there anything unreasonable about stopping the bus when it was visibly malfunctioning and, indeed, even

spraying unknown liquid onto other vehicles. The defendants, therefore, are entitled to summary judgment with regard to any § 1983 claim based on the premise that the initial inspection or decision to allow Newcomer to drive back to the hotel violated the Fourth Amendment.

### 3. Search of Newcomer

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *United States v. Ivy*, 165 F.3d 397, 401 (6th Cir. 1998) (quoting U.S. Const. amend. IV, § 2). Thus, as a general matter, warrantless searches and searches not supported by probable cause are constitutionally unreasonable, except in certain "jealously and carefully drawn" circumstances. *United States v. Worley*, 193 F.3d 380, 385–86 (6th Cir. 1999) (citing *United States v. Watson*, 423 U.S. 411, 427 (1976)); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("[A] search conducted without a warrant issued upon probable cause is per se unreasonable subject only to a few specifically established and well-delineated exceptions.") (internal ellipsis omitted). One of those exceptional circumstances, asserted by the defendants here, is that the search was conducted pursuant to voluntary and valid consent. *Worley*, 193 F.3d at 386; *Schneckloth*, 412 U.S. at 219; *United States v. Beauchamp*, 659 F.3d 560, 571–572 (6th Cir. 2011); *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).

An individual's consent to the search must have been "unequivocally, specifically, and intelligently given, uncontaminated by any duress or coercion." *Worley*, 193 F.3d at 386 (citation omitted); *accord Beauchamp*, 659 F.3d at 571. "[A] search based on consent requires more than the mere expression of approval to the search." *United States v. Jones*, 641 F.2d 425, 429 (6th Cir. 1981), *overruled on other grounds by Steagald v. United States*, 451 U.S. 204 (1981). That is, the alleged statement of consent must be "an unequivocal statement of free and voluntary

consent, not merely a response conveying an expression of futility in resistance to authority or acquiescing in the officers' request." *Worley*, 193 F.3d at 386. Whether the alleged consent meets this standard "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227; *accord Worley*, 193 F.3d at 386. Thus, "there is no 'magic' formula or equation that a court must apply in all cases to determine whether consent was validly and voluntarily given." *Worley*, 193 F.3d at 386.

Although the troopers examined Newcomer's bus and log book at the Parthenon, they did not search his person or his bags until the bus was pulled over off of Briley Parkway. Before any of those searches were performed, Sergeant Simmons expressly asked Newcomer if he objected, to which Newcomer responded, "No, go right ahead." (Docket No. 120 ¶ 45.) Newcomer, however, argues that disputed issues of fact preclude concluding that that apparent consent was voluntary. He argues that, in light of the unusual and stressful circumstances in which he had been placed, a jury could conclude that his "will ha[d] been overborne and his capacity for self-determination critically impaired." *Schneckloth*, 412 U.S. at 225. Specifically, Newcomer notes that he was surrounded by several troopers—six or seven, by his count—"all barking orders" leading to "mass of confusion." (Docket No. 111 at 10.) In this situation, he argues, he merely involuntarily acceded to the search.

The video that has been filed with the court does not depict a scene as chaotic as Newcomer suggests. The court has little doubt that the situation in which Newcomer found himself was likely very stressful. There is no indication, however, that the stress of the situation obscured or overwhelmed his decision to consent to the search. Moreover, the unusual details of the situation are somewhat mitigated by the fact that, at its core, Newcomer's interaction with the troopers was based around a motor carrier inspection process that was inherent to the industry in

which Newcomer had worked for years. The fact that a bus might fail an inspection, leading to delay and interactions with law enforcement, is a foreseeable part of operating an interstate charter bus business, even if the details of this particular inspection, especially the decision to allow Newcomer to drive the bus back to the hotel and the ensuing mechanical problems, may have been unusual. Newcomer has not identified facts sufficient for a jury to conclude that his consent to the searches of his body and bags was involuntary or invalid.

**4. Arrest of Newcomer**

The defendants argue that the arrest of Newcomer was supported by probable cause that he had committed at least one of three offenses: possession of a controlled substance, possession of drug paraphernalia, and/or DUI. Newcomer argues that disputed issues of material fact preclude a conclusion that the troopers possessed probable cause with regard to any of those offenses. The defendants respond that, insofar as there is any question regarding whether there was actual probable cause, the troopers are, in the alternative, entitled to qualified immunity.

### a. Probable Cause in Light of Disputed Facts

A warrantless arrest is permissible under the Fourth Amendment only "where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *see also United States v. Watson*, 423 U.S. 411, 417–424 (1976). "A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005) (emphasis added). In considering whether an arresting officer had probable cause to effect the arrest, the court must "consider the totality of the circumstances and whether the facts and circumstances of which [the arresting officer] had knowledge at the moment of the arrest were sufficient to warrant a prudent person . . . in believing . . . that the

seized individual ha[d] committed . . . an offense." *Sykes v. Anderson*, 625 F.3d 294, 306 (6th Cir. 2010) (alterations in original; internal quotation marks and citations omitted).

Newcomer focuses most of his argument on whether the troopers had probable cause to arrest him for driving under the influence, with particular attention to (1) the dispute over whether he actually had white powder in his nose and (2) whether Trooper Pitts' field sobriety test was adequately performed. The defendants respond that, regardless of whether there was actually powder in Newcomer's nose, he had admitted to using Norco the night before, not long before he started driving the bus, and that he had made statements confirming that he not merely ingested, but snorted, the medication—although Newcomer now claims those statements were sarcastic or the result of confusion. Those facts, along with the field sobriety test, were, the defendants argue, sufficient to support probable cause that Newcomer was driving under the influence.

Tennessee's DUI statute, however, is not a strict-liability prohibition on driving after having taken a potential intoxicant. Rather, with regard to non-alcohol intoxicants, Tenn. Code Ann. § 55-10-401 forbids a driver from driving while "*[u]nder the influence of* any intoxicant . . . affecting the central nervous system . . . *that impairs the driver's ability to safely operate a motor vehicle* by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess." Tenn. Code Ann. § 55-10-401(1) (emphasis added). Tennessee courts have endorsed the following definition of what it means to be "under the influence of an intoxicant," as it applies to substances other than alcohol:

> The expression "under the influence of an intoxicant" covers not only all well-known and easily recognized conditions and degrees of intoxication, but also any mental or physical condition which is the result of taking an intoxicant in any form and *which deprives one of that clearness of mind and control of one's self which one would otherwise possess*. In this situation, it would not be necessary that the person be in such a condition as would make him or her guilty of public

drunkenness. The law merely requires that the person be under the influence of an intoxicant. *The degree of intoxication must be such that it impairs to any extent the driver's ability to operate a vehicle.*

*State v. Santelli*, No. E2015-01004-CCA-R3-CD, 2016 WL 3563423, at *9 (Tenn. Crim. App. June 22, 2016) (emphasis added), *appeal denied* (Oct. 20, 2016); *see also State v. Brooks*, 277 S.W.3d 407, 412 (Tenn. Crim. App. 2008) (approving of jury instruction based on similar language); 7 Tenn. Prac. Pattern Jury Instr. Crim. 38.01 (recommending similar language for jury instruction in DUI cases).

In the absence of undisputed evidence explaining the degree of intoxication that law enforcement could reasonably infer from Newcomer's admissions, the court cannot grant summary judgment to the defendants on the ground that those admissions created probable cause for a DUI arrest. Moreover, while Newcomer's field sobriety test might have been sufficient to create probable cause for arrest, the plaintiffs have identified disputed issues of fact with regard to whether that test was competently performed or yielded results corroborative of intoxication. The court, therefore, will not grant the defendants summary judgment on the ground that the troopers had probable cause to arrest Newcomer for DUI.

Similarly, disputed issues of fact preclude granting summary judgment on the ground that the troopers had probable cause to arrest Newcomer for unlawful use of, or possession with intent to use, drug paraphernalia based on the straw allegedly found in his pill bottle. Tennessee courts have recognized that a straw may qualify as drug paraphernalia if it is, in the words of the statute, "possess[ed] with intent to use [the straw] to . . . ingest, inhale, or otherwise introduce into the human body a controlled substance or controlled substance analogue." Tenn. Code Ann. § 39-17-425(a)(1); *see, e.g.*, *State v. McCoy*, No. E2012-01859-CCA-R3CD, 2013 WL 1143255, at *5 (Tenn. Crim. App. Mar. 20, 2013) ("The jury was within its prerogative to find that

appellant possessed the straw and to infer that the straw was drug paraphernalia she intended to use for an illicit purpose. Therefore, the evidence was sufficient to support appellant's conviction for possession of drug paraphernalia."). If, in fact, Newcomer did have a straw in his pill bottle, an inference that he intended to use the straw to snort medication would probably have been warranted. Newcomer, though, denies that any straw was ever in his pill bottle or anywhere else on his person. His own apparent admissions regarding snorting, moreover, did not confirm use of a straw, but rather suggested that he may have, if anything, used a dollar bill, the night before and out of state. Because the location of the straw is disputed, the court will not grant summary judgment on the ground that the troopers had probable cause to arrest Newcomer for possession of drug paraphernalia.

Last, the defendants contend that the troopers had probable cause to arrest Newcomer for unlawful possession of a controlled substance. It is undisputed that, under Tennessee law, hydrocodone is a controlled substance. Tenn. Code Ann. § 39-17-408(b)(1). "It is an offense for a person to knowingly possess or casually exchange a controlled substance, unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of professional practice." Tenn. Code Ann. § 39-17-418(a). Because Norco is, it is undisputed, a drug commercially and licitly available pursuant to a prescription, mere possession of the drug is not, in and of itself, unlawful. At all times, including during the stop, Newcomer has maintained that he obtained Norco pursuant to a valid prescription, and it appears undisputed that he had a prescription to obtain the pills in at least some dosage.

However, the defendants point out that (1) Newcomer was carrying some of his medication in an unmarked pill bottle, (2) some of his medication had been reduced to powder form, and (3) Newcomer was in possession of one 10 mg pill, despite the fact that his current

prescription was for 7.5 mg. The defendants do not cite to any case law suggesting that either of the first two of those facts is sufficient to create probable cause that the person possessing the medication lacked a valid prescription, particularly where, as here, he had evidence of a prescription for that medication readily available in his bags. Nor do they cite to any Tennessee law suggesting that it is, in and of itself, illegal to move validly prescribed pills from their original bottle to a second container. Tenn. Code Ann. § 39-17-418(a) contains no such prohibition. Tennessee's legend-drug statute, which provides an additional layer of restrictions with regard to the handling of prescribed drugs, is similarly silent on the issue:

> It is unlawful for any person to have in the person's possession, any drug defined or enumerated in this part, without the drug having been prescribed by a duly licensed physician, certified physician assistant, dentist, optometrist authorized pursuant to § 63-8-102(12), or veterinarian, and having been dispensed by a pharmacy duly licensed and registered in this state, unless the person was a resident of another state and had the prescription filled by a duly licensed and registered pharmacist of the other state.

Tenn. Code Ann. § 53-10-105(a); *compare* N.Y. Pub. Health Law § 3345 ("Except for the purpose of current use by the person or animal for whom such substance was prescribed or dispensed, it shall be unlawful for an ultimate user of controlled substances to possess such substance outside of the original container in which it was dispensed."). The defendants also cite no statute forbidding possession of crushed hydrocodone pills.[4]

Newcomer's possession of the 10 mg pill is the undisputed fact seemingly most suggestive that he had committed a crime. His ability to document a valid prescription for another dosage, however, lent some credibility to his claim that he merely possessed that pill pursuant to a prior prescription. The parties have not identified any cases affirmatively resolving whether, in the unusual circumstances at issue here, Newcomer's possession of a single pill of

---

[4] The legend-drug statute does prohibit the possession of "deteriorated" drugs, Tenn. Code Ann. § 53-10-106, but the defendants have not relied on that prohibition.

the incorrect dosage would have been sufficient to support his arrest under Tennessee law. The lack of clarity on this front, however, creates another obstacle to Newcomer's unlawful arrest claim: the possibility that the troopers are, as they argue, entitled to qualified immunity.

### b. Qualified Immunity

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In resolving a government official's claim to qualified immunity, the court must "look to whether (1) the facts that the plaintiff has alleged or shown establish the violation of a constitutional right, and (2) the right at issue was 'clearly established' at the time of the alleged misconduct." *Stoudemire v. Mich. Dep't of Corrs.*, 705 F.3d 560, 567 (6th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The district court has discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

The "key determination" is whether the defendant who claims qualified immunity "was on notice that his alleged actions were unconstitutional." *Grawey v. Drury*, 567 F.3d 302, 313 (6th Cir. 2009). The Supreme Court has stressed that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This does not mean that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Id.* Rather, it means that, "in light of pre-existing law[,] the unlawfulness must be

apparent." *Id.* (collecting cases); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). A defendant bears the initial burden of putting forth facts suggesting that he was acting within the scope of his discretionary authority. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992). The ultimate burden of proof, however, is on the plaintiff to show that the defendant is not entitled to qualified immunity. *Id.*

The determinative question, then, is whether, resolving all disputed issues of fact in favor of Newcomer, the troopers should have been on notice that his arrest for possession of a controlled substance would have been unlawful. The parties agree on a number of facts that a reasonable trooper could consider at least potentially suggestive that Newcomer had misused his drugs and/or possessed at least one pill for which he lacked a prescription: namely, Newcomer's possession of the either ground or crumbled medication; his keeping some of his medication in an unmarked bottle; and his possession of one pill in a greater dosage than his documented prescription amount. Newcomer also made some statements during his interrogation that, whether the result of sarcasm or nervousness, would have given a reasonable trooper the impression that Newcomer had snorted the medication at some point.

Based on the totality of the circumstances, and, in particular, Newcomer's possession of the 10 mg pill without an associated bottle, there was at least a reasonable question with regard to whether the troopers had probable cause to arrest Newcomer. Accordingly, they are entitled to qualified immunity, and the court will grant summary judgment with regard to the wrongful arrest claim against the troopers.

## 4. Tennessee's Treatment of Out-of-State Buses

The plaintiffs have alleged that (1) Tennessee singles out out-of-state buses for inspection in violation of the Fourteenth Amendments guarantee of equal protection and (2) the defendants unlawfully interfered with Budget's rights to engage in interstate travel and commerce. The defendants maintain that Tennessee does not discriminate between in-state and out-of-state carriers and that it merely engages in an ordinary, permissible regime of enforcing basic safety requirements for buses.

Generally speaking, a state's "promotion of domestic business by discriminating against nonresident competitors is not a legitimate state purpose" and may run afoul of the Equal Protection Clause, as well as the Commerce Clause. *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 882 (1985). The plaintiffs, however, have not identified any facts supporting their contention that Tennessee discriminates against out-of-state buses. To the contrary, the plaintiffs have conceded that the reason Trooper Barker and Sergeant Norris were doing motor coach inspections on the day in question was that the federal government paid or contributed to their overtime pay for doing so—a motivation that does not imply any particular hostility, on their or Tennessee's part, to out-of-state buses. (Docket No. 120 ¶ 8.) Nor have the plaintiffs produced any evidence from which discrimination could be inferred, such as examples of comparatively lenient treatment of Tennessee buses. Because the plaintiffs have identified no evidence of a policy or practice of discrimination, the defendants are entitled to summary judgment on this aspect of the plaintiffs' claim.

"The constitutional right to travel from one State to another . . . occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized." *Johnson v. City of Cincinnati*, 310 F.3d 484, 495–96 (6th Cir. 2002)

(quoting *United States v. Guest*, 383 U.S. 745, 757 (1966)). The courts have never held, however, that the constitutional right to travel precludes a state or the federal government from imposing motor carrier safety requirements. "Rather, it protects interstate travelers against two sets of burdens: 'the erection of actual barriers to interstate movement' and 'being treated differently' from intrastate travelers." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 277 (1993) (quoting *Zobel v. Williams*, 457 U.S. 55, 60, n.6 (1982)). Relatedly, but independently, the Supreme Court has construed the Constitution's Commerce Clause to limit a state's power to interfere in or discriminate against interstate commerce, absent a congressional authorization. *Byrd v. Tenn. Wine & Spirits Retailers Ass'n*, 883 F.3d 608, 619 (6th Cir. 2018).

The plaintiffs argue, in conclusory fashion, that the defendants "interfered with [Budget's] interstate travel by ruining [its] reputation in Pennsylvania and causing loss of contracts with schools, especially California High School, that would have chartered buses to Tennessee and elsewhere." (Docket No. 111 at 13.) They cite no case law, however, for the proposition that simply harming the reputation of a business that happens to be out-of-state amounts to a deprivation of its right to engage in interstate travel or commerce. Because the plaintiffs have failed to articulate facts or law supporting a constitutional violation, the defendants are entitled to summary judgment with regard to the plaintiffs' Commerce Clause, discrimination against out-of-state businesses, and right-to-travel claims.

## 5. Eighth Amendment Claims

The plaintiffs argue that Newcomer's humiliation and detention amount to a violation of his Eighth Amendment right not to be subject to cruel and unusual punishment. The defendants counter that what Newcomer has articulated is, at most, a claim of unlawful arrest and that he has

identified no case law that would permit him to transform an ordinary wrongful arrest claim into a claim based on cruel and unusual punishment.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The plaintiffs have not identified any case law recognizing an Eighth Amendment violation arising solely out of the embarrassment and reputational harm associated with a pre-conviction arrest. Nor have they cited any case law to support their argument that a claim for unlawful detention should be considered under the Eighth Amendment, rather than under the Fourth and Fourteenth Amendments. The defendants, accordingly, are entitled to summary judgment with regard to the plaintiffs' claims arising out of the Eighth Amendment.

## 6. Claim for Injunctive Relief Related to the MCSAP

The plaintiffs have requested injunctive relief requiring the State of Tennessee to comply with MCSAP requirements, particularly those set out in 49 U.S.C. § 31102(c)(2)(W). The defendants, in response, argue that 49 U.S.C. § 31102(c)(2)(W) does not create a right enforceable via § 1983 and, in the alternative, that the state is in compliance with the provisions cited.

In order for a statutory provision to be enforceable through § 1983, "1) 'Congress must have intended that the provision in question benefit the plaintiff'; 2) the asserted right must not be 'so vague and amorphous that its enforcement would strain judicial competence'; and 3) 'the statute must unambiguously impose a binding obligation on the States.'" *D.O. v. Glisson*, 847 F.3d 374, 377 (6th Cir. 2017) (quoting *Blessing v. Freestone*, 520 U.S. 329, 340–41 (1997)). The court must consider, in particular, whether the federal statute at issue includes "the sort of

'rights-creating' language critical to showing the requisite congressional intent to create new rights." *Id.* at 378 (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002)).

The plaintiffs have argued that the troopers violated the MCSAP requirement that inspections only be performed "at a bus station, terminal, border crossing, maintenance facility, destination, or other location where a motor carrier may make a planned stop (excluding a weigh station)."[5] 49 U.S.C. § 31102(c)(2)(W). The defendants argue that that provision is not enforceable through § 1983, because it was not intended to benefit Newcomer or Budget. To the contrary, a limitation on when and where inspections may be performed, which specifically limits inspections to situations where they would be the least intrusive on the ordinary business of the motor carrier, is plainly intended to benefit motor carriers. The rule set forth in 49 U.S.C. § 31102(c)(2)(W) is not vague or amorphous, and the language of the statute appears, on its face, to be mandatory. The court, accordingly, would be inclined to conclude that 49 U.S.C. § 31102(c)(2)(W) is enforceable through § 1983.

Reaching that issue, however, is unnecessary, because the plaintiffs have not identified any facts that would support finding a violation of 49 U.S.C. § 31102(c)(2)(W). Although the plaintiffs do not concede that the Parthenon was a "location where a motor carrier may make a planned stop," they identify no reason why it would not be. Indeed, a museum tour by a bus's passengers would seem to be a paradigmatic "planned stop." While the events of April 21, 2016 continued on to an unplanned stop off of Briley Parkway, that stop was the result of the bus's obvious malfunctioning and, insofar as it was an inspection, would have been permissible under 49 U.S.C. § 31102(c)(2)(W)'s exception for "obvious safety hazard[s]." Because the plaintiffs

---

[5] The plaintiffs originally also alleged that Tennessee had failed to submit and enter into a CVSP under the MCSAP. (Docket No. 41 ¶¶ 57–59.) It is now undisputed that Tennessee has, in fact, submitted and received federal approval of such a plan. (See Docket No. 83-21.)

have not alleged any actions inconsistent with 49 U.S.C. § 31102(c)(2)(W), they are not entitled to summary judgment with regard to that provision.

Finally, the plaintiffs argue that the court should order the TSHP to adopt more stringent express requirements restricting the discretion of troopers in initiating inspections, pursuant to the argument advanced by the Tennessee Court of Criminal Appeals in *McClure*. For the reasons explained above, however, the defendants are entitled to summary judgment on the ground that the state's motor carrier inspection program is, as a matter of law, a constitutionally permissible regime of commercial inspections in a pervasively regulated industry. The defendants, therefore, are entitled to summary judgment in that regard.

### 7. Conspiracy

Finally, the defendants argue that the plaintiffs have failed to articulate any actionable conspiracy, between any of the defendants, to violate the constitutional or statutory rights of either Budget or Newcomer. Newcomer suggests that Trooper Barker, Sergeant Simmons, and Sergeant Norris all engaged in an unlawful conspiracy to fabricate evidence against him, namely testimony that (1) there was white powder in his nose and (2) the straw found at the scene was found in Newcomer's pill bottle. The truth with regard to each of these allegations is, Newcomer emphasizes, disputed, and he argues that, if a jury credits Newcomer's version, it could also conclude that three troopers embarked on a conspiracy to corroborate each other's false accounts.

"A civil conspiracy under § 1983 is 'an agreement between two or more persons to injure another by unlawful action.'" *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir.2011) (quoting *Revis v. Meldrum*, 489 F.2d 273, 290 (6th Cir. 2007)). To prevail on a civil conspiracy claim under § 1983, the plaintiffs must show that (1) a single plan existed; (2) each defendant shared in the general conspiratorial objective to deprive the plaintiff of his constitutional rights,

and (3) an overt act was committed in furtherance of the conspiracy that caused injury to the plaintiff. *See Bazzi*, 658 F.3d at 602. "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy and each conspirator need not have known of the details of the illegal plan or all of the participants involved." *Id.* (internal brackets omitted); *see also Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 563 (6th Cir. 2011).

Generally speaking, arrest and detention of a person based on known false evidence violates the constitutional guarantee of freedom from unreasonable searches and seizures. *See Jenkins v. Louisville-Jefferson Cty. Metro Gov't*, No. 3:17-CV-151-DJH, 2018 WL 345119, at *8 (W.D. Ky. Jan. 9, 2018) (collecting cases). Newcomer's arrest, however, was not contingent on any falsified evidence about powder in his nose or a straw in a bottle. Regardless of what Trooper Barker, Sergeant Simmons, and Sergeant Norris may have agreed to with regard to the powder and straw, Newcomer's arrest was occasioned by at least two other events external to that conspiracy: (1) Trooper Pitts' and Matsunaga's field sobriety test and (2) Newcomer's conceded possession of a Norco pill in a dosage for which he did not have documentation of a valid prescription. Newcomer, of course, has raised issues, on the merits, with regard to the lawfulness of his arrest based on those facts. But even if Trooper Pitts' field sobriety test was so incompetently performed that it could not have given rise to probable cause, there is no evidence that the flaws in the test were part of any conspiracy or that Trooper Pitts' errors were the result of anything other than sloppiness or poor training. Newcomer, moreover, had admitted to snorting medication and had revealed, via a consent search, that he possessed one pill that was stronger than his documented prescription, which, whether or not those facts were sufficient to support an arrest on their own, surely bolstered the results of the field sobriety test. There is no evidence, then, to suggest that any fabricated testimony was necessary to, or the cause of,

Newcomer's detention. Newcomer was later released and the charges against him were eventually dropped, so there is no issue regarding a false prosecution based on the allegedly fabricated evidence. The court, therefore, will grant the defendants summary judgment with regard to the plaintiffs' conspiracy claims.

## 8. Liability of State-Level Officials: Deliberate Indifference

Finally, the plaintiffs argue that the alleged violations of their constitutional rights were the result of deliberate indifference of state level officials, namely Commissioners Purkey and Gerregano, in their supervision of the TSHP. The plaintiffs' arguments closely mirror their arguments regarding Tennessee's compliance with the MCSAP; they suggest that the troopers' treatment of Newcomer was the result of Purkey's and Gerregano's general lack of oversight regarding motor carrier inspections and the absence of more explicit and restrictive rules regarding how and when those inspections may be performed.

The court has held that the only colorable constitutional violation that the plaintiffs have supported is the allegation that he was arrested without probable cause. The plaintiffs, however, have not identified any way in which that violation was the result of the improper oversight of motor carrier inspections, other than that the interaction between Newcomer and the troopers happened to begin with such an inspection. The actual facts on which the troopers relied for their arrest decision arose out of (1) consent searches that were not part of the inspection and (2) the field sobriety test. The deliberate indifference alleged is conclusory, conjectural, and only tenuously related to the alleged violation. The court, accordingly, will grant summary judgment to the defendants with regard to his deliberate indifference theory.

## 9. Summary

With regard to all of the plaintiffs' claims, the defendants have demonstrated that they are entitled to summary judgment either because (1) the plaintiffs have failed to identify facts supporting a constitutional violation or (2) the relevant defendants are entitled to qualified immunity. Based on the facts before the court, the troopers initiated a lawful motor carrier inspection, which turned up a few violations, but the troopers allowed Newcomer to drive his passengers back to the hotel. Along the way, the bus started visibly malfunctioning, and the troopers initiated a stop. There, Newcomer consented to searches that, because of his consent, comported with the Constitution. Based on the results of those searches, the results of a field sobriety test, and Newcomer's statements, he was arrested. It is questionable whether that arrest was supported by probable cause for two reasons: (1) numerous key facts about the encounter are in dispute and (2) it is disputable whether the troopers could infer anything unlawful from Newcomer's possession of a single pill of a different dose than he could immediately produce prescription documentation for. The plaintiffs, however, have failed to identify case law that would have alerted reasonable troopers to the contours of Newcomer's rights in this situation. Accordingly, the troopers are entitled to qualified immunity for the arrest. None of the plaintiffs' arguments regarding conspiracy or deliberate indifference support claims against the commissioners of the TDSHS or TDR. Accordingly, the defendants are entitled to summary judgment on all counts.

### B. The Plaintiffs' Motions for Partial Summary Judgment

The plaintiffs have technically filed three motions for partial summary judgment, although two of them are substantively duplicates. The plaintiffs' First Motion for Partial Summary Judgment (Docket No. 79), which they had originally filed as merely their "Motion for

Partial Summary Judgment" two days before (Docket No. 75), asks the court to enter an order "finding that Plaintiff Allen Newcomer was not under the influence of Hydrocodone, alcohol, or any other drug on April 21, 2016." (Docket No. 79 at 1.) The plaintiffs' Second Motion for Partial Summary Judgment asks the court to "find[] that Plaintiff Allen Newcomer was unreasonably seized tantamount to an arrest by the Defendant Tennessee Highway Patrolmen at the Parthenon on April 21, 2016, in violation of his Fourth Amendment rights." (Docket No. 78 at 1.)

With regard to the first motion, the defendants correctly point out that whether Newcomer was intoxicated is not strictly at issue in this case. "A valid arrest based upon then-existing probable cause is not vitiated if the suspect is later found innocent." *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) (citing *United States v. Covelli*, 738 F.2d 847, 854 (7th Cir.) (1984)). By the same token, an arrest without probable cause is not redeemed by the fact that an arrestee is later discovered to have committed a crime. While Newcomer's desire to have some formal vindication of himself is understandable, the court will not issue an advisory opinion on an issue that is not necessary to the resolution of this case. The court will note, however, that the government was given its opportunity to attempt to prove that Newcomer was intoxicated and it chose not to do so, electing, instead, to drop the charges against him *nolle prosequi*—"not wish to prosecute." Moreover, even if it would not have been determinative, the defendants in this case surely would have benefited from evidence establishing Newcomer's intoxication, but they have not produced it. The result is that the allegation that Newcomer was intoxicated while driving the bus on April 21, 2016, has never been proven in any court of law, including this one. The court will say no more than that.

Newcomer's second motion is devoted to an issue fully addressed herein. The troopers' interactions with Newcomer at the Parthenon were not an unreasonable seizure tantamount to arrest. All of Newcomer's motions, accordingly, will be denied.

### IV. CONCLUSION

For the foregoing reasons, the Motion for Partial Summary Judgment (Docket No. 75), First Motion for Partial Summary Judgment (Docket No. 79), and Second Motion for Partial Summary Judgment (Docket No. 78) filed by Budget and Newcomer will be denied. The Motion for Summary Judgment (Docket No. 83) filed by the defendants will be granted.

An appropriate order will enter.

ENTER this 27th day of November 2018.

ALETA A. TRAUGER
United States District Judge